IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARLENE APP,                          :         No. 4:08-CV-0358
                    Plaintiff         :
                                      :         Judge John E. Jones III
              v.                      :
                                      :
AETNA LIFE INSURANCE                  :
COMPANY,                              :
                    Defendant         :

## MEMORANDUM

August 11, 2009

In this action, plaintiff Darlene App seeks long term disability benefits

pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA").

Before the Court on the cross-motions for summary judgment of App (Doc. 22)

and defendant Aetna Life Insurance Company ("Aetna") (Doc. 20).  For the

reasons set forth below, both motions will be granted in part and denied in part,

and this matter will be remanded to Aetna for further consideration.

## I.      STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(c).  Initially, the moving party bears the

burden of demonstrating the absence of a genuine issue of material fact.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985). However, the facts and all reasonable inferences drawn therefrom must be viewed

in the light most favorable to the non- moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment." *Anderson*, 477 U.S. at 247-48.

The concurrent resolution of cross-motions for summary judgment, as are presented here, can present a formidable task. *Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown*, 318 F. Supp. 2d 230, 235 (M.D. Pa. 2004) (citing 10A Charles Alan Wright *et al.*, Federal Practice and Procedure § 2720 (3d ed. 1998)). On cross-motions for summary judgment, the standard of review does not change. Each moving party must independently show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). However, the mandate of Rule 56 that the court view all facts in the light most favorable to the non-moving party may be difficult to apply where all parties are

both moving and non-moving parties. "Inferences to which a party is entitled with respect to the opponent's motion may not be granted with respect to its own." *Interbusiness Bank, N.A.*, 318 F. Supp. 2d at 236 (citing *United States v. Hall*, 730 F. Supp. 646, 648 (M.D. Pa. 1990)). Such circumstances may require separate opinions on the respective motions. *See Rains*, 402 F.2d at 245; *Hall*, 730 F. Supp. at 648.

In this case, however, the essential facts are substantially undisputed and are wholly supported by the evidence submitted by all parties. Whether the facts are viewed in the light most favorable to the plaintiff or the defendant, the same story unfolds. The present cross-motions for summary judgment will therefore both be decided by this memorandum and order. *See Interbusiness Bank*, 318 F. Supp. 2d at 236 (relying on the mandate of Fed. R. Civ. P. 1 that the Federal Rules of Civil Procedure "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action" in concurrently deciding cross-motions for summary judgment in single opinion).

## II. BACKGROUND

With this standard of review in mind, the following are the undisputed material facts derived from the parties' statements of material facts (Docs. 25, 27) and responses thereto (Docs. 29, 32).

Effective November 1, 2006, the plaintiff, Darlene App, became a participant in a long term disability policy maintained by her employer.[1]  The plan is fully insured and underwritten by Aetna, which also serves as the plan administrator.  With respect to Aetna's authority, the plan provides:

> For the purpose of section 503 of Title 1 of the Employee Retirement Income Security Act of 1974, as amended (ERISA), Aetna is a fiduciary with complete authority to review all denied claims for benefits under this policy.  In exercising such fiduciary responsibility, Aetna shall have discretionary authority to determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy.  Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily or capriciously.

(Doc. 24 at 7.)

The policy also includes an exclusion for pre-existing conditions which states:

> No benefit is payable for any disability that is caused by contributed to by a "pre-existing condition" and starts before the end of the 12 months following your effective date of coverage.
>
> A disease or injury is a pre-existing condition if, during the 3 months before you effective date of coverage:
> - it was diagnosed or treated; or
> - services were received for the diagnosis or treatment of the disease or injury; or

---

[1] App describes her employer as Healthcare Recovery Specialists, Inc, while Aetna describes her employer as Boston Insurance Employee Benefit Trust.  Neither party disputes the other's description, so presumably these are the same or related entities.

- you took drugs or medicines prescribed or recommended by a physician for that condition.

(Doc. 24 at 5.)

The oldest medical record provided by the parties indicates that App treated with her longtime physician John H. Persing, M.D. on May 1, 2006. (Doc. 28 at 155.) She complained of chills, fever, chest pain, pain in her right flank, and blood in her urine. Dr. Persing's assessment was that App had a urinary tract infection, uterine fibroids[2], and chronic hematuria[3] with possible Alport syndrome[4]. Dr. Persing prescribed antibiotics and sent for a urinalysis. Three days later, App met with Dr. Persing again with complaints of fever, chills, and right costal and rib pain. (*Id.* at 154.) Dr. Persing continued App on antibiotics and told her to follow up in a week.

---

[2] Uterine fibroids are non-cancerous tumors made of muscle cells and other tissues that grow in and around the wall of the uterus. MedlinePlus, U.S. National Library of Medicine of the National Institutes of Health ("MedlinePlus"), "Uterine Fibroids," available at http://www.nlm.nih.gov/medlineplus/uterinefibroids.html.

[3] Hematuria is the presence of blood or red blood cells in the urine. Stedman's Medical Dictionary(27th ed. 2000).

[4] "Alport syndrome is a genetic condition characterized by kidney disease, hearing loss, and eye abnormalities. People with Alport syndrome experience progressive loss of kidney function. Almost all affected individuals have blood in their urine (hematuria), which indicates abnormal functioning of the kidneys." Genetics Home Reference, U.S. National Library of Medicine of the National Institutes of Health, "Alport syndrome," available at http://ghr.nlm.nih.gov/condition=alportsyndrome.

On May 11, 2006, App treated with Dr. Persing, complaining of continued difficulty with her joints, kidney pain, and muscle spasms. (*Id.* at 153.) After a physical examination, Dr. Persing noted inflammatory arthritis in App's hands. He diagnosed App with inflammatory arthritis, chronic hematuria, and possible Alport syndrome. Dr. Persing prescribed Plaquenil[5] with Motrin[6] and Skelaxin[7]. On May 24, 2006, App again treated with Dr. Persing, complaining of continued difficulties and also presenting with a cold and a sore throat. (*Id.* at 152.) Dr. Persing continued to note a "rheumatologic disorder", hematuria, Alport syndrome, and uterine fibroids, and added a diagnosis of an upper respiratory infection. During June and July 2006, App treated with Dr. Persing on four more occasions, continuing to complain of hematuria, tiredness, and pain in her muscles, joints, and kidneys. (*Id.* at 148-51.) Dr. Persing continued to diagnose inflammatory arthritis, uterine fibroids, hematuria, and probable Alport syndrome, as well as a "chronic

---

[5] Plaquenil is a brand name for hydroxychloroquine, a drug used to treat discoid or systemic lupus erythematosus and rheumatoid arthritis in patients whose symptoms have not improved with other treatments. MedlinePlus, "Hydroxychloroquine," available at http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a601240.html.

[6] Motrin is a brand name for prescription ibuprofen, which is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. MedlinePlus, "Ibuprofen," available at http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a682159.html.

[7] Skelaxin is a brand name for metaxalone, a muscle relaxant. MedlinePlus, "Metaxalone," available at http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682010.html.

long- standing immunologic disorder" based on App's long-standing cough.  Dr.

Persing prescribed Mobic or Relafen as additional treatment for App's arthritis.[8]

(*Id.* at 149.)  Dr. Persing also prescribed doxycycline[9] and Bactrim[10] for App's

respiratory problems.  (*Id.* at 151-52.)

On August 2, 2006, App treated with Dr. Persing, complaining of back and

kidney pain, muscle spasms, achiness, tiredness, and having to sleep 10-14 hours a

night. (*Id.* at 147.)  Dr. Persing continued to diagnose inflammatory arthritis,

chronic uterine fibroids, chronic hematuria, and chronic immunologic disorder.  He

continued the same medication and treatment.

On August 16, 2006, App again saw Dr. Persing, complaining of pain in her

knee and pain in her left pectoral area that had continued for the last two months.

(*Id.* at 146.)  Dr. Persing diagnosed inflammatory arthritis, uterine fibroids, chronic

---

[8] Mobic is a brand name for meloxicam.  Relafin is a brand name for nabumetone.  Both drugs are used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. MedlinePlus, "Meloxicam," available at http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a601242.html; "Nabumetone," available at http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a692022.html.

[9] Doxycycline is an antibiotic is used to treat bacterial infections, including pneumonia and other respiratory tract infections; Lyme disease; acne; infections of skin, genital, and urinary systems; and anthrax.  MedlinePlus, "Doxycycline," available at http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682063.html.

[10] Bactrim is a brand name for co-trimoxazole, a combination of trimethoprim and sulfamethoxazole.  This sulfa drug is used to eliminate bacteria that cause various infections, including infections of the urinary tract, lungs (pneumonia), ears, and intestines.  MedlinePlus, "Co-trimoxazole," available at http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a684026.html.

hematuria, possible Alport syndrome, an immunologic disorder, and "possible lymph node left axilla[11]."  Dr. Persing recommended an ultrasound of the axilla as soon as possible and continued other treatment.

On August 23, 2006, App again treated with Dr. Persing.  (*Id.* at 145.)  His notes indicated that App "has not been good."  App complained of fever, nausea, and vomiting.  Dr. Persing diagnosed inflammatory arthritis, chronic uterine fibroids, chronic hematuria, and a urinary tract infection, and noted suspected Alport syndrome.  Dr. Persing recommended switching medication from Bactrim to Augmentin[12].  He also noted that App had been on a Z-pak[13], which did not help.

On August 31, 2006, App again treated with Dr. Persing and noted that despite some soreness, her left axilla feels fairly well.  (*Id.* at 144.)  Dr. Persing noted that nothing suspicious was found on the ultrasound.  Dr. Persing's assessment continued to include inflammatory arthritis, uterine fibroids, hematuria,

---

[11] Axilla is the armpit.  Stedman's Medical Dictionary (27th ed. 2000).

[12] Augmentin is a brand name for a combination of amoxicillin and clavulanic acid used to treat certain infections caused by bacteria, including infections of the ears, lungs, sinus, skin, and urinary tract.  MedlinePlus, "Amoxicillin and Clavulanic Acid," available at http://www.nlm.nih. gov/medlineplus/druginfo/meds/a685024.html.

[13] A Z-pak is a common packaging of Zithromax, a brand name for azithromycin, which is used to treat certain infections caused by bacteria, such as bronchitis; pneumonia; sexually transmitted diseases; and infections of the ears, lungs, skin, and throat.  MedlinePlus, "Azithromycin," available at http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697037.html.

and a urinary tract infection. He directed App to continue taking Pen Vee K[14] for a week and to continue Plaquenil and Motrin.

On September 12, 2006, App again treated with Dr. Persing and noted that she had stopped taking the antibiotics because of nausea. (*Id.* at 143.) App complained for a lot of back and flank pain and weakness. App noted that she was going to take a week off of work to rest. Dr. Persing continued to diagnose inflammatory arthritis, uterine fibroids, hematuria, and a urinary tract infection. He recommended that App continue antibiotics and rest for a week.

On September 19, 2006 App again treated with Dr. Persing and complained of nausea, vomiting, and being unable to eat, as well as hematuria. (*Id.* at 142.) Dr. Persing's notes indicate that App's urinalysis showed nitrates, protein, and hematuria. Dr. Persing continued to diagnose inflammatory arthritis, hematuria, and a urinary tract infection. He recommended that App finish her antibiotics and remain off work. Dr. Persing prescribed Donnatal[15] for her nausea. He also recommended a pregnancy test and CT scan of App's abdomen.

---

[14] Pen Vee K is a brand name for penicillin V potassium, an antibiotic used to treat certain infections caused by bacteria such as pneumonia, scarlet fever, and ear, skin, and throat infections. MedlinePlus, "Penicillin V Potassium Oral," available at http://www.nlm.nih.gov/medlineplus/druginfo/meds/a685015.html.

[15] Donnatal is a brand name for a combination of belladonna alkaloids and phenobarbital used to relieve cramping pains in conditions such as irritable bowel syndrome and spastic colon and to treat ulcers. MedlinePlus, "Belladonna Alkaloid Combinations and Phenobarbital," available at http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601024.html.

On September 26, 2006, App again treated with Dr. Persing. (*Id.* at 141.) His notes indicate that App continued to have proteinuria[16] and white cells and red cells in her urine. App reported feeling a little stronger with the steroid prednisone. Dr. Persing diagnosed proteinuria and continued to diagnose inflammatory arthritis, hematuria, and a urinary tract infection. He ordered a CT scan of App's abdomen and recommended that she return to work the following week.

On October 12, 2006, App reviewed all of her studies to date with Dr. Persing. (*Id.* at 140.) App continued to have hematuria, continued to be followed for Alport syndrome, and her labs showed proteinuria. Dr. Persing continued to diagnose inflammatory arthritis, chronic hematuria, and a urinary tract infection, and noted observation for Alport syndrome. He recommended App continue on antibiotics for her sore throat and made no other changes in medication or treatment.

On October 30, 2006, App treated with Dr. Persing, stating that she felt that she may have had a kidney stone. (*Id.* at 139.) However, App stated that she was

---

[16] Proteinuria is a condition in which urine contains an abnormal amount of protein and is a sign of chronic kidney disease. National Kidney and Urologic Diseases Information Clearinghouse, National Institute of Diabetes and Digestive and Kidney Diseases, National Institute of Health, "Proteinuria," available at http://kidney.niddk.nih.gov/kudiseases/pubs/proteinuria.

feeling the best she had in a year or two.  Dr. Persing diagnosed heartburn, kidney stone, and inflammatory arthritis, and continued App's medication.

From November 2006 through January 2007, App saw Dr. Persing six more times.  (*Id.* at 133-38.)  App's symptoms of kidney pain, aches, pains, sore throat, and nausea worsened.  Dr. Persing's assessment continued to include inflammatory arthritis, hematuria, uterine fibroids, a urinary tract infection, kidney stones, and possible Alport syndrome.  On February 7, 2007, after the results of an antinuclear antibody test[17] came back high, Dr. Persing diagnosed App with lupus.[18]  (*Id.* at 132.)

---

[17] Antinuclear antibodies or ANA are antibodies that identify normal, naturally-occurring proteins as being "foreign" and dangerous and may signal the body to begin attacking itself.  A positive ANA test indicates the presence of such antibodies and may indicate autoimmune diseases, such as lupus, scleroderma, Sjögren's syndrome, and others.  However, a positive test by itself does not indicate the presence of an autoimmune disease.  *See* American College of Rheumatology, "Antinuclear Antibodies (ANA)," available at http://www.rheumatology.org /public/factsheets/diseases_and_conditions/ana.asp.

[18] Lupus, the most common type of which is systemic lupus erythematosus or SLE, is a chronic inflammatory disease that can affect the skin, joints, kidneys, lungs, nervous system, and other organs of the body. Usually, patients have skin rashes and arthritis, as well as fatigue and fever.  American College of Rheumatology, "Systemic Lupus Erythematosus (Lupus)," available at http://www.rheumatology.org/public/factsheets/diseases_and_conditions/lupus.asp.  Lupus is labeled the "great imitator" because of its wide variety of symptoms which mimic other conditions, and is difficult to diagnose.  *Id.*  Physicians frequently use a list of 11 common criteria developed by the American College of Rheumatology in diagnosing lupus.  *See* American College of Rehumatology, "The 1997 Update of the 1982 American College of Rheumatology Revised Criteria for Classification of Systemic Lupus Erythematosus," available at http:// www.rheumatology.org/publications/classification/SLE/1997UpdateOf1982RevisedCriteriaClas sificationSLE.asp?aud=pat.

App applied for LTD benefits on April 26, 2007. She listed the nature of her disability as lupus. (Doc. 24 at 12.) In an attending physician statement, Dr. Persing listed a primary diagnosis of lupus and a secondary diagnosis of inflammatory arthritis. (*Id.* at 13.) On June 7, 2007, Aetna denied App's claim based on the plan's pre-existing condition exclusion. (*Id.* at 14.) After reviewing Dr. Persing's and other records, Aetna determined that App had received treatment and taken medication for her conditions during the "look-back period" of August 1, 2006 to October 31, 2006. On November 26, 2007, App appealed the denial of her claim. Aetna conducted a review of further records. In addition, Mark Burns, M.D. conducted a physician review of App's records. (*Id.* at 28-29.) Dr. Burns concluded that App had inflammatory arthritis before and during the look-back period. Dr. Burns also concluded that "[t]he available documentation does not clearly establish the diagnosis of SLE," but nonetheless concluded that "[e]ven if the diagnosis of SLE is established, it would become the specific cause of the arthritis already present during this time period." (*Id.* at 28.) On the basis of its and Dr. Burns's review, Aetna upheld the denial of benefits on January 7, 2007. App then filed suit in this Court seeking review of Aetna's denial pursuant to § 502(a) of ERISA, 29 U.S.C. § 1132 (a).

## III. DISCUSSION

### A. ERISA Standard of Review

The Court must first determine the appropriate standard of review to apply to App's § 502(a) claim. The Third Circuit recently explained that "'a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.' When the administrator has discretionary authority to determine eligibility for benefits ... the decision must be reviewed under an arbitrary and capricious standard." *Doroshow v. Hartford Life & Acc. Ins. Co.*, --- F.3d ----, 2009 WL 2257384, at *2 (3d Cir. July 30, 2009) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). In this case, the plan expressly provides Aetna, the administrator, with discretionary authority to determine eligibility for benefits, and, therefore, Aetna's benefits decision must be reviewed under the arbitrary and capricious standard.

App argues that the plan does not confer discretionary authority on Aetna based solely on poor word choice in a letter from an Aetna representative. On January 31, 2008, plaintiff's counsel wrote to Aetna requesting that it provide him "a copy of the Plan or summary plan description." Aetna responded by letter of February 21, 2008, stating that a "complete" copy of the plan was enclosed. In

fact, however, enclosed with the letter was only a summary of coverage. App

claims that because the enclosed documents do not contain an explicit grant of

discretionary authority, the plan does not contain one. App does not deny that a

truly complete copy of the plan was produced by Aetna and does not dispute that

the plan documents indeed contain the express grant of discretionary authority to

determine eligibility for benefits which is quoted in full above. In light of these

facts, App's argument is patently incorrect. The arbitrary and capricious standard

of review applies.

"Under a traditional arbitrary and capricious review, a court can overturn the

decision of the plan administrator only if it is without reason, unsupported by

substantial evidence or erroneous as a matter of law. The scope of this review is

narrow, and 'the court is not free to substitute its own judgment for that of the

defendants in determining eligibility for plan benefits.'" *Id.* at *4 (quoting

*Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)).

App argues that a heightened level of scrutiny applies because of the conflict

of interest created by the fact that Aetna both funds and administers the plan. The

Supreme Court has held, however, and the Third Circuit recently confirmed, that

the existence of a conflict does not change the standard of review, but is only one

factor among many that a court should consider in reviewing a benefits

determination. *Id.* at *3-4 (citing *Metropolitan Life Insurance Co. v. Glenn*, ---U.S. ----, 128 S. Ct. 2343, 2350-51 (2008)).[19]

## B. Determination of Disability Based on Inflammatory Arthritis

It appears that App does not challenge Aetna's denial of benefits for disability based on inflammatory arthritis. In her complaint in this action and throughout her briefs on the summary judgment motions, App only contends that she is entitled to benefits for disability based on lupus. In fact, App's medical records during the look-back period are replete with references to diagnosis, treatment, and medication for inflammatory arthritis, and thus, it cannot be found that Aetna's denial of benefits for disability based on this condition was unreasonable. (*See, e.g.*, Doc. 24 at 15-23.) Aetna's motion for summary judgment will be granted as to App's claim, if any, regarding the denial of benefits for inflammatory arthritis.

## C. Determination of Disability Based on Lupus

Aetna's denial of benefits for App's disability based on the purported pre-existence of lupus, however, is arbitrary and capricious. The Third Circuit has comprehensively addressed the pre-existing condition exclusion in circumstances

---

[19] The parties' briefs in this matter were submitted prior to the Third Circuit's decision in *Doroshow*. However, the Supreme Court's decision in *Glenn*, which was handed down almost six months prior to the filing of motions for summary judgment in this case, and to which App cites in her brief, made clear that a conflict of interest does not change the standard of review.

analogous to this case.  In *Lawson ex rel. Lawson v. Fortis Insurance Co.*, 301 F.3d 159 (3d Cir. 2002), Elena Lawson was taken to the emergency room two days before her insurance policy became effective for what was diagnosed as a respiratory tract infection.  One week later, after the effective date of her policy, she was diagnosed as having leukemia.  The defendant insurer denied coverage for expenses related to the leukemia on that ground that it was a pre-existing condition, which the policy defined as a "Sickness, Injury, disease or physical condition for which medical advice or treatment was recommended by a Physician or received from a Physician" during the look-back period.  *Id.* at 161.  In affirming the district court's granting the plaintiffs' motion for summary judgment on their breach of contract claim, the court held that the word "for" "has an implicit intent requirement" and that "it is hard to see how a doctor can provide treatment 'for' a condition without knowing what that condition is or that it even exists."  *Id.* at 165.  The court noted that:

> for the purposes of what constitutes a pre-existing condition, it seems that a suspected condition without a confirmatory diagnosis is different from a misdiagnosis or an unsuspected condition manifesting non-specific symptoms, as was the case here.  When a patient seeks advice for a sickness with a specific concern in mind ... or when a physician recommends treatment with a specific concern in mind ... it can be argued that an intent to seek or provide treatment or advice "for" a particular disease has been manifested.  But when the patient exhibits only non-specific symptoms and neither the patient nor the physician has a particular concern in mind, or when the patient turns out not to have a

suspected disease, it is awkward at best to suggest that the patient sought or received treatment for the disease because there is no connection between the treatment or advice received and the sickness.

*Id.* at 166. Finding "no evidence that the possibility that Elena's condition was actually leukemia ever entered the minds of Elena's parents or [her doctor]," the court held that the doctor did not offer medical advice or treatment for Elena's leukemia. The *Lawson* court further justified its holding by noting that:

considering treatment for symptoms of a not-yet-diagnosed condition as equivalent to treatment of the underlying condition ultimately diagnosed might open the door for insurance companies to deny coverage for any condition the symptoms of which were treated during the exclusionary period. To permit such backward-looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of preexisting condition as to make that term meaningless: any prior symptom not inconsistent with the ultimate diagnosis would provide a basis for denial.

*Id.* (citation omitted).

The Third Circuit again addressed the pre-existing condition exclusion in *McLeod v. Hartford Life & Accident Insurance Co.*, 372 F.3d 618 (3d Cir. 2004). There, the plaintiff was denied long-term disability benefits because of the alleged pre-existence of his multiple sclerosis. He had sought treatment during the look-back period for a variety of non-specific symptoms and was treated for a host of ailments, but during this period, neither the employee nor his doctors suspected multiple sclerosis. The plan in that case defined a pre-existing condition as "any

accidental bodily injury, sickness ... or any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, mental illness ... for which you received Medical Care during" the look-back period. *Id.* at 621. Relying on *Lawson*, the court held that Hartford's denial of benefits was arbitrary and capricious. The court rejected Hartford's interpretation of the policy, stating:

> Under Hartford's interpretation of the Plan, any symptom experienced before the excludable condition is diagnosed could serve as the basis for an exclusion so long as the symptom was not later deemed inconsistent with that condition.... The problem with using this type of ex post facto analysis is that a whole host of symptoms occurring before a "correct" diagnosis is rendered, or even suspected, can presumably be tied to the condition once it has been diagnosed. Thus, any time a policy holder seeks medical care of any kind during the look-back period, the "symptom" that prompted him to seek the care could potentially be deemed a symptom of a pre-existing condition, as long as it was later deemed consistent with symptoms generally associated with the condition eventually diagnosed.

*Id.* at 625. The court reaffirmed *Lawson*'s distinction between a "suspected condition without a confirmatory diagnosis" and "a misdiagnosis or an unsuspected condition manifesting non-specific symptoms. *Id.* at 628. Finding no evidence that the plaintiff or her physicians ever suspected that she was suffering from multiple sclerosis during the look-back period, the court remanded for the entry of summary judgment in favor of the plaintiff. *Id.*

Finally, the Third Circuit recently addressed the pre-existing condition exclusion again in *Doroshow*. In that case, the plan defined a pre-existing condition as one "for which medical treatment or advice was rendered, prescribed or recommended" during the look-back period. 2009 WL 2257384 at * 1. The defendant, Hartford, found that the plaintiff's amyotropic lateral sclerosis ("ALS") was pre-existing because he had discussed ALS with his physician due to his symptoms and family history, even though the physician had noted that the plaintiff's condition "[w]as not felt to be ALS." *Id.* The plaintiff had also received advice and undergone testing related to ALS and was referred to an ALS specialist prior to the look-back period. The Third Circuit upheld Hartford's denial of benefits. The court stated that "we do not find generally that ruling out a condition constitutes advice or treatment for that condition." *Id.* at *4. However, in light of the plaintiff's medical history and his physician's notes regarding ALS, the court found that "a diagnosis of ALS was repeatedly considered." *Id.* at *4-5. The court found that the case presented a "suspected condition without a confirmatory diagnosis" as stated in *Lawson*. *Id.* at *5.

The facts of this case are much closer to *Lawson* and *McLeod* than to *Doroshow*. As detailed above, although App was diagnosed with and received treatment during the look-back period for symptoms that, in hindsight, appear

consistent with lupus, there is no evidence that at any point prior to February 2, 2007 either App or Dr. Persing suspected App to be suffering from lupus or considered such a diagnosis. This case thus presents "a misdiagnosis or an unsuspected condition manifesting non-specific symptoms," *Lawson*, 301 F.3d at 166, which the Third Circuit has repeatedly held is a not a pre-existing condition.

In support of its denial of benefits, Aetna cites to an October 9, 2007 letter from Dr. Persing to App's attorney in which Dr. Persing states that App "has been on and off Plaquenil, which has been used for rheumatoid arthritis and inflammatory arthritis, as well as lupus." (Doc. 24 at 24.) Aetna contends, based on this statement, that it is arguable that App was treated for lupus during the look-back period even though it was not formally diagnosed until later. Dr. Persing's letter, however, clearly refers to the entirety of App's treatment, and nothing in the sentence cited to by Aetna or the letter as a whole suggests that Dr. Persing prescribed Plaquenil during the look-back period as a treatment for lupus. Quite to the contrary, Dr. Persing's contemporaneous notes from App's office visits during the look-back period make clear that Plaquenil was prescribed as treatment for arthritis. The fact that Plaquenil may also be used to treat lupus does not mean that it was here.

Aetna also notes that because App's arthritis and hematuria, which were diagnosed during the look-back period, are two of the criteria used to diagnosis lupus, it is "highly likely" that App had lupus during this period even though Dr. Persing chose not to administer an ANA test until later. As an initial matter, this assertion is factually misleading. The record reveals that App was given an ANA test in June 2006, just before the look-back period, which returned negative results. (Doc. 28 at 102.) More importantly, however, this argument presents precisely the type of "backward-looking reinterpretation of symptoms" which the *Lawson* and *McLeod* courts rejected as depriving the pre-existing condition exclusion of all meaning. *McLeod*, 372 F.3d at 625; *Lawson*, 301 F.3d at 166.

Aetna also relies on Dr. Burns's conclusion in his review of App's records that her inflammatory arthritis was caused by her lupus. In hindsight, this is a reasonable conclusion. However, during the look-back period, there is no indication whatsoever that Dr. Persing or App suspected or considered lupus to be the underlying cause of App's arthritis. It is admittedly awkward to find that a pre-existing condition (inflammatory arthritis) may have been caused by a non-pre-existing condition (lupus). But under the terms of the plan, a condition is not pre-existing simply because it follows a potentially related pre-existing condition. Rather, the exclusion requires that some action have occurred with regard to the

condition *during the look-back period*:  the condition must have been diagnosed or treated, services must have been received for the diagnosis or treatment of the condition, or medication must have been prescribed or recommended for the condition.  (*See* Doc. 24 at 17.)  The fact that Dr. Burns is able to say *now* that App likely had lupus during the look-back period is irrelevant because no doctor ever said *then* that she had the condition, and it is the diagnosis, treatment, and prescriptions during the look-back period which define a pre-existing condition.

Aetna attempts to distinguish *Lawson* and *McLeod* on the ground that the policy language at issue here is different than the language at issue in those cases.  Aetna notes that its policy defines a disease as a pre-existing condition if "[i]t was ... treated" during the look-back period, and argues that because App received treatment for symptoms of lupus during the look-back period, it is reasonable to conclude that App received treatment for lupus during that period.  Aetna's interpretation, however, reads the term "treated" entirely in the abstract.  The policy language at issue here is not so different to ignore *Lawson*'s holding that a doctor cannot provide treatment for a condition without knowing that the condition exists.  301 F.3d at 166.  "Seeking medical care for a symptom of a pre-existing condition can only serve as the basis for exclusion from receiving benefits in a situation where there is some intention on the part of the physician or of the patient

to treat or uncover the underlying condition which is causing the symptom."

*McLeod*, 372 F.3d at 628. There is no indication that during the look-back period either Dr. Persing or App were attempting to treat lupus, and therefore, her lupus is not a pre-existing condition. App's motion for summary judgment on this claim will be granted.

### D. Remedy

"Upon finding that a plan administrator acted arbitrary and capriciously, a court may either remand the case to the administrator for a re-evaluation of the claim or retroactively award benefits." *Addis v. Limited Long-Term Disability Program*, 425 F. Supp. 2d 610, 620 (E.D. Pa. 2006). In her summary judgment motion, App requests that the Court determine her eligibility for benefits. However, the Court finds that remand is appropriate in this case. Because Aetna denied benefits based on the pre-existing condition exclusion, it never determined whether App was totally disabled under the terms of the policy. (*See* Doc. 14 at 3.) In addition, the parties have placed in the record only those portions of the administrative record relevant to the pre-existing condition issue, and therefore, the Court may not have before it the information required to make a full benefits determination. For these reasons, the Court will remand the case to Aetna for

further consideration consistent with this opinion.  An appropriate order will be

entered.